No. 39,553

FRANK W. STORM and IRENE STORM, his wife; R. E. CARTER and ORDELLA H. CARTER, his wife; and JESSIE V. PICKERELL, a widow, *Appellants*, v. BARBARA OIL COMPANY, a Corporation, *Appellee*.

(282 P. 2d 417)

Opinion filed April 9, 1955.

*W. Luke Chapin*, of Medicine Lodge, argued the cause, and *George D. Ramspeck*, of Medicine Lodge, was with him on the briefs for the appellants.

*John F. Eberhardt*, of Wichita, argued the cause, and *Andrew F. Schoeppel*, *Samuel E. Bartlett*, *George B. Powers*, and *Paul H. White*, all of Wichita, and *Riley W. MacGregor*, *Vernon F. Coss*, and *J. W. MacGregor*, all of Medicine Lodge, were with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This appeal was taken from an order of the district court granting appellee ninety days to commence, or cause to be commenced, the drilling of an oil or gas well to be completed with due diligence to test the Douglas formation in the Medicine Lodge area and to develop the lease subject to further order of the court or, in the alternative, to release appellee's lease as to the undeveloped acreage. The appellants, landowners, asked for cancellation of appellee's oil and gas lease and a one sixteenth royalty mineral deed on the grounds of inadequate development.

The following facts have been compiled from uncontradicted and agreed statements in the pleadings, from stipulations and oral admissions in the trial of the case, from uncontradicted testimony of witnesses, and stipulations and admissions in the pretrial conferences:

The discovery well in the Medicine Lodge gas field was the Alexander No. 1, which was located slightly southeast of the center of section 13, township 33 south, range 13 west, and was completed on or about January 13, 1927. The original lease under consideration dated July 25, 1927, was executed to appellee by R. E. Carter (signature acknowledged on August 1, 1927), by Ordella H. Carter, his wife (signature acknowledged on August 4, 1927), and by J. W. Storm and E. A. Storm, his wife (signatures acknowledged on August 4, 1927). The lease covered 600 acres lying in sections 1, 2 and 11, and was for a primary term of five years or as long as oil or gas was produced by lessee or the premises were being developed. If no well were commenced on or before March 1, 1928, the lease should terminate unless $600.00 rental were paid, which would extend the time of drilling for twelve months. These terms were set out on a general form for such leases with the specific parts filled in by typewriter. The lessors, under the foregoing lease, entered into a sale of one sixteenth of the oil and gas royalty agreement under date of August 4, 1927, with respective dates of acknowledgment of signatures the same as they were in the lease.

(This court is including in the record a map which shows the lease in question and the producing wells in close proximity thereto. This map does not reflect the entire Medicine Lodge gas field, but it is sufficient to assist the reader so he may more clearly understand the situation before the court. It follows:

TOWNSHIP ___33 South,___ ,RANGE ___13 West___ , COUNTY ___Barber___ , STATE ___Kansas___

Appellants Frank W. Storm, Ordella H. Carter, and Jessie V. Pickerell were children and heirs of J. W. and E. A. Storm, both now deceased.

Appellee drilled Carter No. 1 to a depth of 3,880 feet where, on June 25, 1928, tools were lost and were never recovered. Carter No. 2 was completed in November, 1928, as a producing gas well and is still a commercial well. Carter No. 3, which was completed on February 4, 1930, was a dry hole and Carter No. 4, which was completed on February 2, 1932, was also a dry hole. Appellee had not developed the 600 acre tract since Carter No. 4. Carter No. 2 had produced $1,500,000 in gas production, of which appellee had received $1,407,000 (about $52,000 annually) and appellants had received $93,000 (about $3,500 annually), from the Mississippi formation.

Appellants do not contend there was any fraud or overreaching in taking the lease and royalty conveyance, but they do contend they were one and the same transaction, which would cause cancellation of both in the event the lease were cancelled. Appellee contends they were separate and distinct transactions with separate considerations, the lease consideration being $1.00 and the royalty consideration being $3,000.

Production of gas in the field prior to 1952 was exclusively in the Mississippi formation, but since 1952 there had been additional production in the Douglas formation.

Appellants made no demands prior to 1953 which were followed by legal action, and they do not contend that any oral demands were made between 1941 and 1953. Appellants admit that on or about July 29, 1953, appellee's agent, Riley W. MacGregor, offered appellant, J. W. Storm, a possibility of drilling on the 600 acres in question at an indefinite time in the future if appellants' claim against appellee were dropped. Appellants claimed that the company had abandoned its rights and they refused to let appellee drill. During a pretrial conference appellee accused appellants of requiring forfeiture, but appellants contended that appellee had abandoned all rights in the lease and the royalty conveyance.

On June 27, 1953, appellants made written demand on appellee stating, in substance, that there had been no development on the 600 acres for over fifteen years; appellee had drilled producing wells south and east of appellants' property and gas wells were drilled to the north of the 600 acres; on several occasions requests were

made by appellants for appellee to drill on the 600 acres, but no wells had been drilled; the lease and royalty conveyance of appellee had, therefore, been *forfeited* by failure to comply with appellee's obligations to appellants except the 160 acres where Carter No. 2 is located; and finally, appellants requested that within twenty days appellee should release and quit claim the lease and royalty conveyance to appellants except the 160 acres aforementioned.

Appellee replied in a letter dated July 14, 1953, wherein it stated, in substance, that it had been considering the matter of testing appellants' property for Douglas gas possibilities, but if appellants' letter of June 27, 1953, meant that appellants intended to start court action, appellee would have to await the determination of the court action before it could be justified in commencing drilling operations.

On July 28, 1953, appellants again wrote appellee and mentioned several conversations had with appellee's agent wherein it was stated that the purpose of the letter of June 27, 1953, was to request a release of the lease and royalty conveyance; the second letter further stated appellee had waited "far too long" and that through its agent appellee was to release the lease and the royalty conveyance except the 160 acres under Carter No. 2; and appellants would re-lease the 440 acres on customary terms providing for commencement of a well thereon within sixty days; that since no reply had been received from appellee on this proposition, the only alternative was court action, but they would wait a few more days for acceptance of the above offer before filing.

Appellants filed their action, the issues were joined, pretrial conferences were had and a trial ensued. Appellant Storm testified that he had numerous conversations over the years with agents of appellee, but there was no demand until June 27, 1953.

There was uncontroverted testimony of William Ziska, vice-president and treasurer of appellee, to the effect that the appellee's records reflected that on or about July, 1927, the three original leases covering the Storm 600 acres were consolidated into one lease, and on September 14, 1927, a $3,000 check was issued to pay for the royalty conveyance. The original leases mentioned by Ziska were dated March 26, 1927, with rental paid on March 1, 1927.

In 1952 the Skelly Oil Company discovered gas in the Douglas formation on Lonker No. 1, which was east and a little north of appellants' land. There were orders issued by appellee to stake out an offset on appellants' land, but due to some misinformation

concerning the location of Skelly's Lonker No. 1 on maps, there was no offset staked on appellants' land and the matter was dropped.

Riley W. MacGregor, appellee's agent, testified that on August 3, 1953, appellant Storm told him the same thing he had written in his letter of July 28, 1953, to the effect that the only way he (Storm) would deal with appellee was for appellee to reassign the royalty. Then he would give appellee a new lease on the undeveloped 440 acres if a well were started in sixty days.

Storm testified that he had told appellee's agent Ramsey that unless the royalty conveyance and lease were given up, he would not consent to a well being drilled. He later repeated that appellants were not going to let appellee drill unless it gave up the royalty and lease; that he wasn't interested in the statement of appellee's agent MacGregor when he told him the company would begin to drill a well in about thirty days.

Ramsey, an agent for appellee, testified that appellee was ready, able and willing to commence drilling operations in from five days to a month, but Storm had objected unless appellee would release the lease and the royalty; Ramsey further testified that appellee had within the last one and one half years (prior to July, 1953) given considerable study and consideration to drilling a well, was still willing to drill, and that it took about thirty days to drill a well.

P. F. Amstutz, a petroleum engineer, testified that Carter No. 2 had withdrawn more gas than had originally underlaid the entire 600 acres; in his opinion Carter No. 2 had produced in excess of 22 billion cubic feet of gas measured at 14.65 pounds per square inch absolute; this was more than would have been in the reservoir space under the Carter-Storm 600 acre lease so some of the gas had come from the area around it; from his computations he stated Carter No. 2 had drained gas from an excess of 1,825 acres; he had used thirty-one feet as the sand depth, which was the average productive thickness known from the records of the well, and had considered it was all porous, permeable and gas bearing.

Summing up this witness's testimony, without setting it out in full, gives the conclusion that any well in the Douglas reservoir on the 600 acres would be non-commercial and another well in the Mississippi reservoir would be unnecessary.

The findings and conclusions of the trial court were somewhat lengthy so the full text thereof will not be reiterated here. We will state only the salient and pertinent parts, which were as follows:

The trial court found the lease and royalty conveyance were separate transactions; that to cancel the lease would amount to a forfeiture and would let the mineral deed stand; the law does not favor forfeitures and only where equity clearly demands it will a forfeiture be decreed; there were demands in 1939 and 1941, but there was a question as to whether, after consideration, those were demands or merely arguments to have another test well drilled; there was a demand in January, 1953, and the company gave it some consideration, especially after the written demand in June, 1953; the company tried to negotiate with Storm to withdraw his demand for forfeiture and the company would give him a well, but his belief in forfeiture had built up to where he would rather have a forfeiture than the promise of additional drilling; that forfeiture should not be decreed; that probably the company had not been as diligent as it should have been; that the company should make additional development; that Storm's action in June precluded the company from making further development; and that the company should have additional time under the implied covenants of the lease to make further development; otherwise, the court might enter judgment for nonfulfillment of the implied covenants.

The journal entry of judgment (1) denied cancellation of the mineral interest on the grounds of abandonment; (2) denied a forfeiture or cancellation of the gas lease in the undeveloped portion of the 600 acre tract; (3) ordered commencement of the drilling of an oil or gas test well within ninety days, which was to be completed with due diligence deep enough to test the Douglas formation; ordered appellee to continue development to such an extent as may be prudent and proper subject to the further order of the court concerning additional development, or release the lease as to the undeveloped acreage; and (4) stated the court would retain jurisdiction to make such order, or further orders, as may be necessary.

A timely motion for a new trial was filed, which covered the first, second, fourth and fifth grounds under G. S. 1949, 60-3001 in its first four statements, and then set out a fifth cause:

"The court erred in holding that the oil lease and royalty conveyance were not each a part of the same transaction, in holding that the rights and interest of defendant in the undeveloped portion of the 600 acre tract had not been abandoned prior to time of filing petition herein, and in failing to find that the undeveloped portion of the 600 acre tract . . . had been abandoned by defendant or was subject to forfeiture if not prudently developed hereafter."

The motion for new trial was overruled on March 5, 1954, and

this appeal was taken in due course. The specifications of error substantially were:

The trial court erred in holding the lease and royalty conveyance were not the same transaction; in holding appellee's right in the undeveloped area had not been abandoned; in entering the judgment it did; in holding the failure of appellee to file an affidavit of production was immaterial; in rendering a decision in whole or in part contrary to the evidence; in making its conclusions of law; and in applying the law of forfeiture for failure to develop, rather than applying the law of abandonment on account of delay in development for over twenty years.

All of the appellants sent a letter dated July 26, 1928, to appellee's Mr. Shaffer referring to consolidated leases dated July 26, 1927, and the rental which was paid March 1, 1927, and waiving any rental which was due March 1, 1928, because in appellants' judgment, appellee was putting forth its best efforts to find oil on their land.

The first question presented here is whether the instruments evidenced a single transaction. The undisputed testimony of William Ziska was that appellee's records showed the 600 acres were first covered by three separate leases, and about July, 1927, the three were consolidated into one lease. On September 14, 1927, a $3,000 check was issued in payment of the royalty. These facts are also supported by a letter from Ed Hook, employee of appellee, which stated, in part:

"Herewith is the Storm Carter Royalty deed. You will note that it has not been placed of record. . . . Also enclosing you the Storm-Carter lease which will take the place of the three leases you have in your book under the name of Carter and the one under the name of Storm. Before this one can be recorded we should file a release of the ones on record then file this new one. For your information the new one covers entire 600 acres and the one well will hold that number of acres in place of the ones we have which did not give us enough acreage in one piece. . . . I paid $3,000 for the Storm-Carter royalty and drew the draft which was paid. . . ."

In *Bellport v. Harrison,* 123 Kan. 310, 255 Pac. 52, where a memorandum receipt for $2,400 was given, the receipt in part read:

" '. . . payment for 1/16 royalty on [description of land] title to be delivered as soon as papers are completed.' " (p. 311.)

A dry hole was drilled on the land. The plaintiff, who had paid the $2,400, filed a rescission action and asked for return of the money. The court there said:

"Here the written memorandum used the word 'royalty' in a sense that is perfectly intelligible, having a definite legal meaning. . . . There is no controversy in this case as to the meaning of the fraction one-sixteenth. It is one-half of the landowners' one-eighth provided for in the lease." (p. 315.)

In the sale of the oil and gas royalty under consideration we notice the habendum clause contained the statement,

"An undivided ½ interest in all of the oil, gas, coal and other minerals now, or at any time hereafter, lying in or under the following described tract of land. . . ."

Immediately following the above habendum clause the context conveyed, ". . . an undivided ½ interest in all . . . rights . . . by virtue of any oil and gas mining lease, or other mineral lease, now or hereafter existing . . . and also . . . the irrevocable right . . . of entering . . . searching . . . drilling wells. . . ." There can be no question that the instrument in the present case conveyed both realty in the form of minerals in place and also personalty in the oil, gas or minerals produced. (*Fry v. Dewees,* 151 Kan. 488, 99 P. 2d 844.)

Under the facts and evidence we cannot approve appellants' theory that the royalty conveyance and lease must be considered as one and the same transaction because the royalty deed conveyed a vested interest in the minerals in place by its very terms which were subject to conditions subsequent whereby the interest would terminate at the end of five years unless there was production. Ceasing production after the expiration of five years would also terminate the lease.

Let us assume for the moment that the royalty conveyance was a part of the lease. Appellants admit, at least indirectly, that in order for the royalty conveyance to be cancelled the lease would have to be cancelled. Putting it another way, the lease would of necessity have to be cancelled before the royalty conveyance could be cancelled or terminated. Can this lease be terminated or cancelled on the basis of abandonment? This question must be answered in the negative for the reason that appellee went to quite an expense to drill Carter No. 1, where tools were lost and were never recovered, and then immediately drilled and brought in Carter No. 2, a commercial producing well. Appellee then, in reasonable time, drilled Carter No. 3 and Carter No. 4. Carter No. 2 had produced a huge quantity of gas from which income was realized by both appellants and appellee. Does this show there was an act coupled with intent

to abandon the lease on the part of the appellee? We must answer in the negative, and appellants must do likewise because their desire throughout has been to cancel only the 440 undeveloped acres. There is not one act in the record which shows abandonment if we just ignore the necessary element of intent. The law sometimes implies intent from the actions of the party charged with abandonment, but in the case under consideration there is a complete void of intent and it would be difficult to say there was even an act or fact present which would amount to the first element of abandonment. (1 Am. Jur., Abandonment, §§ 1-13, incl.) Some authorities include failure or omission to act, but in these instances the omission or failure must be coupled with an intent (1 C. J. S., Abandonment, §§ 1-9, incl.) Appellee claims that appellants are pursuing the theory of forfeiture and we need only refer to 1 C. J. S., Abandonment, § 2 (3), p. 6-7, where it is said:

"Accurately speaking, however, there is a plain, fundamental distinction between the two concepts, in this, that abandonment is voluntary in character, and essentially a matter of intention, so that to effectuate it there must neces·sarily be an intention to abandon, while forfeiture is an enforced and involuntary loss of a right, and intention is not an essential element of it, but, on the contrary, a forfeiture may, and in the usual case does, occur against, and contrary to, the intention of the party possessing the right."

For comparison see, also, 37 C. J. S., Forfeitures, § 1, p. 4.

Since forfeiture does not need the element of intention, we may then proceed to consider the applicability of forfeiture to the facts. While it is true that leases of oil and gas are construed in favor of the lessor and against the lessee, we are still confronted with a rule that forfeitures are not looked upon with favor by the courts. (37 C. J. S., Forfeitures, § 4 b, p. 8.) We also find these words, "One who seeks to enforce a forfeiture must himself be free from blame." (37 C. J. S., Forfeitures, § 5 a, p. 11.) Appellants in this case have always accepted the income from Carter No. 2. There were many conversations between Storm and different agents of appellee, but not until the discovery of gas in the Douglas formation in 1953 was there ever any definite and unequivocal demand. How was that demand made? It was to the effect that appellee would not be allowed to drill unless and until the royalty conveyance and lease were surrendered except as to the 160 acres on which Carter No. 2 was located and then appellants would execute a new lease to appellee. Where are the equities in this case?

Gas was discovered in the Douglas formation in 1953; appellants

had been accepting their royalty payments; prior to the Douglas discovery nothing in particular had been demanded by Storm (who was the only appellant who took an active part in the negotiations) in the way of test wells; before there was much production from those new wells, Storm said appellee had *forfeited* its rights by waiting too long.

In what position would appellee have found itself had it entered and started another well after Storm had made the proposition he did to Ramsey and later to MacGregor? Appellants could then have claimed abandonment and would have been in a much more secure position because there would have been an act coupled with apparent intention of abandoning and appellee would have been in a poor, if not an impossible, position to deny it. There is much interesting comment in 58 C. J. S., Mines and Minerals, § 205, p. 502, but the context is too long to set out in full. The rule is clear that the lessor who intends to claim forfeiture cannot accept and retain profits in the way of rents or royalties or if development is an element, he then has a duty to demand that development proceed or commence.

There is an element here that neither party has touched upon. There is discussion throughout the record that there are 160 acres producing and 440 acres which are unproductive and undeveloped. We do not wish to appear to be technical, but are wondering just how we can say where productivity begins and where it leaves off. The lease was originally broken into three lease contracts and later was consolidated by the parties. In the case of *Spikes v. Weller,* 159 Kan. 597, 156 P. 2d 540, a demurrer to the petition was sustained by the trial court and affirmed by this court on appeal.

The Spikes case was based on one lease which involved the east half of a section and the lessors were seeking a cancellation by forfeiture as to the northeast quarter of the section. They had accepted rentals thereon beyond the primary term. There was a producing well on the southeast quarter but no market for the gas. The lease provided for rental on the southeast quarter until a market was obtained and rentals on the northeast quarter until a well was drilled thereon. The court said (p. 601) notwithstanding appellant's contention that by the terms of the lease there were in effect two leases because the lease was never operated as a unit, but that there was a separation of the lease, so that it may be said there was a lease on the southeast quarter, kept alive by the gas well, and a

lease on the northeast quarter, which expired January 12, 1938, and then stated that on its face there was only one lease, and the extension agreement and affidavit referred to only one lease. Appellant's contention that the lease was never operated on the east half but was operated separately on the southeast quarter and on the northeast quarter was contradicted by the written instruments. The case we have under consideration has been dealt with more equitably by the trial court than in the Spikes case for the reason that appellants here not only claim there is only one lease, but that the royalty conveyance is a part thereof. It would be reading something into the lease to say that 160 acres are producing and 440 acres are undeveloped and subject to forfeiture.

Appellants raise the question of failure to file an affidavit of production, but we need only to read the statute (G. S..1949, 55-205) to see that it is clear and unambiguous and is a notice statute to the public.

We conclude from the record that the trial court did not err in holding that the oil and gas lease and the sale of the oil and gas royalty were separate and independent contracts; in holding that the rights of appellee were not abandoned or forfeited in any part of the 600 acres; in allowing additional time in which appellee could further develop the lease; in finding an affidavit of production mere notice to the public and not grounds for abandonment or forfeiture as between the parties to a lease; in its decision for it was supported by the evidence and the conclusions of law were not erroneous; and finally, in applying the rules of forfeiture instead of abandonment.

The judgment of the trial court is affirmed in all particulars.