No. 54,031

MAXINE ROOK and JOHN ROOK, *Appellees,* v. JAMES E. RUSSELL PETROLEUM, INC., a corporation, *Appellant.*

(679 P.2d 158)

Opinion filed March 24, 1984.

*John R. Toland,* of Toland & Thompson, of Iola, argued the cause, and *Stanley E. Toland,* of the same firm, was with him on the briefs for the appellant.

*Orville J. Cole,* of Cole & Doering, of Garnett, argued the cause, and *Steven B. Doering,* of the same firm, was with him on the brief for the appellees.

*Don O. Concannon,* of Concannon, Traster & Concannon, of Hugoton, and *Charles J. Meyers* and *Craig R. Carver,* of Gibson, Dunn & Crutcher, of Denver, Colorado, were on the brief for the *amicus curiae,* Douglas Energy Company, Inc.

*Glenn D. Young, Jr.,* of Gott, Young & Bogle, P.A., of Wichita, *Judson S. Woodruff* and *Eugene Kuntz,* of McAfee & Taft, of Oklahoma City, *Harry Landt,*

of Amoco Production Company, of Denver, Colorado, and *R. H. Frick,* of Amoco Production Company, of Chicago, Illinois, were on the brief for the *amicus curiae,* Amoco Production Company.

The opinion of the court was delivered by

SCHROEDER, C.J.: This case comes before the court for review of the decision of the Court of Appeals found at 8 Kan. App. 2d 412, 658 P.2d 1059 (1983). James E. Russell Petroleum, Inc., (defendant-appellant) appealed from the trial court's determination that it had abandoned its oil and gas production rights under two oil and gas leases to land owned by Maxine Rook Cooper and her son John Rook (plaintiffs-appellees). The Court of Appeals modified the trial court's ruling, holding that where evidence of a breach of implied covenant of an oil and gas lease is relied upon to infer the intent to abandon and the lease has been extensively developed in the past, the lessor is required to make demand for performance upon the lessee prior to initiating a lawsuit before a court will cancel the lease. The Court of Appeals ordered that the appellant be given 60 days to begin production efforts before the oil and gas leases would be deemed cancelled. We granted review.

The facts are summarized in the Court of Appeals opinion, 8 Kan. App. 2d 412-13, but for purposes of review an expanded version is warranted. James Russell purchased the leases in question in 1963 from W. S. Fees, the original lessee, and subsequently sold them to the defendant corporation in 1973. Two adjacent tracts of land situated in Anderson County are involved, hereinafter referred to as "Tract I" and "Tract II."

Tract I (the Southeast Quarter of Section 22, Township 22, Range 19, Anderson County, Kansas) is covered by an oil and gas lease executed between the original landowner and Fees in 1921, and a supplemental agreement executed on June 27, 1936. Under the original oil and gas lease the landowner is to receive a one-eighth royalty from all gas and oil produced and to have gas supplied free of charge to the principal dwelling on the premises. The supplemental agreement expanded the terms of the original lease by allowing the property to be used for the storage and removal of natural gas. The landowner was paid a sum in exchange for his royalty interest in gas remaining in the land at depths not exceeding 1,050 feet below the surface. As consideration for the storage rights the lessee was to pay the landowner

an annual gas storage rental of $1.00 per acre. The habendum clause of the lease was enlarged by the agreement to provide:

"SECOND: The term of said oil and gas lease shall be and is hereby enlarged so as to run as long as oil and gas or either of them is produced, and as long thereafter as the premises above described shall be utilized for the introduction, storage and/or removal of natural gas (whether introduced into or withdrawn from this or other land) and/or as long as the storage rentals hereinafter fixed shall be paid."

The agreement also stated:

"SIXTH: Lessee shall have the right to assign said lease as hereby modified as to all or any portion of the acreage covered thereby or as to any interest therein, and upon any such assignment, Lessee shall have thereafter no personal liability as to any covenant of said modified lease in respect to the acreage or interest as to which assignment has been made."

At the same time the supplemental agreement pertaining to Tract I was executed, the landowner and Fees entered into a similar oil, gas and underground gas storage lease covering Tract II (the North Half of Section 22, Township 22, Range 19, Anderson County, Kansas). As in the lease pertaining to Tract I, the lessor was paid a sum for his interest in the gas remaining in the land above 1,050 feet, and the lessee was required to pay an annual storage rental of $1.00 per acre for the right to store gas on the premises and furnish free gas to the landowners for living purposes. The gas storage rental provision in the lease additionally provides:

"During such times as Lessee is not producing any of such minerals from sands or formations containing them in their original state, Lessee may during the primary term hereof defer development from year to year by the payment of an annual rental in the same amount and in the same manner as herein provided, which payment shall be in addition to the storage rental herein provided."

The habendum clause of this lease provides:

"2. This lease shall remain in force for a term of ten years from this date and so long thereafter as oil, gas, casinghead gas or other kindred products [are] produced or the storage right is being exercised as hereinafter set forth."

The lease also stated:

"12. Lessee shall have the right to assign this lease as to all or any portion of the acreage covered thereby or as to any interest therein, and upon any such assignment Lessee shall have thereafter no personal liability as to any covenant thereof in respect to the acreage or interest as to which assignment has been made, and the default of either owner shall not affect the other."

The supplemental agreement pertaining to Tract I provides the lessee may relinquish its gas storage rights at any time it becomes unprofitable to continue such operations, and the lease pertaining to Tract II provides the lessee may continue its gas storage operation from year to year beyond the expiration of the primary term of the lease by the payment of annual storage rentals as long as the lessee deems it necessary or convenient to do so.

In 1937 Fees assigned to Cities Service Gas Company all his gas production and gas storage rights existing under the Tract I and Tract II leases at depths not exceeding 1,050 feet from the surface. This assignment was made subject to a contract between Fees and Cities Service Gas Company, dated March 18, 1936. A supplemental contract relating to the assignment of the gas rights was executed by the parties on March 31, 1937, specifically making the leasehold subject to the provisions of Section IV of the contract executed March 18, 1936, entitled "Future Operation of Leaseholds." This provision of the March 18, 1936, contract specifically reserved to Fees all oil rights under the two leases and all gas production rights at depths below 1,050 feet. In addition, it provided that the assignor (Fees) had the right to elect to obtain an assignment of the assignee's (Cities Service) interests in the leasehold at such time as the assignee no longer has any use for the leasehold.

As stated previously, Fees subsequently transferred his rights and interests in these leases to James E. Russell in 1963, who transferred them to the defendant corporation in 1973. The assignment of the oil and gas leases by Fees in 1963 to Russell was for a consideration of $75,000.00, payment of which was secured by a reservation of one-eighth of the seventh-eighths working interest free of all costs. The assignment then specifically stated:

"4. *Assignee expressly covenants and agrees that,* until said Production Payment of $75,000.00 is retired and discharged in full in the manner provided for herein, that Assignee, *for himself and his* heirs, executors, administrators and *assigns will cause the producing oil wells on said leases to be operated in a good, prudent and workmanlike manner, to the end that each well capable of producing oil in paying quantities under reasonable prudent operations shall continue to produce its daily allowable, if it has an allowable, and, if not, then to the extent of its capacity; Assignee does hereby stipulate and agree that a well is capable of producing oil 'in paying quantities' so long as the value of the oil attributable to the Assignee's interest therein, less said Production Payment*

*interest, exceeds the costs of operation* (including the well's proportionate share of all expenses of operating in the field in which the well is located) *and that no such well will be plugged or abandoned;* provided, however, that nothing shall prevent Assignee from abandoning a well which is not producing in paying quantities, nor from converting present or future oil producing wells to input wells. *Assignee agrees to comply with all expenses and implied covenants of the said oil and gas leases.*" (Emphasis added.)

The plaintiff and her husband purchased the two tracts in 1961. In 1963 when Fees' interests in the leases were assigned to Russell, there were sixteen producing oil wells on the tracts. Records indicate production from these wells was marginal after 1959, with 48 barrels of oil being produced in 1965. *Russell ceased production of these wells in 1966, and since that time no oil or gas has been produced and no new wells have been drilled* by either Russell or the appellant corporation of which Russell is president. Cities Service Gas Company has continually exercised its gas storage and production rights under the 1937 assignment. It has paid the annual storage rental and furnished free gas to the landowner since that time. The rights of Cities Service Gas Company under the leases are not contested by the plaintiffs. Cities Service Gas Company was joined as a third-party defendant to this lawsuit, but was later dismissed.

At the time this lawsuit was filed in January 1980 no production or active exploration had been undertaken under the lease rights for fifteen years. James E. Russell, president and chief executive officer of the appellant corporation, testified at the trial production of the wells was marginally economical under then existing methods of recovery. However, prior studies had indicated there were additional oil reserves which were potentially available using other recovery methods. Consequently, the wells were not plugged so they could be used at a future time. Equipment left on the property was allowed to rust and deteriorate. In the early 1970's the pump house was torn down and removed after it was partially demolished in a storm. The power source equipment was also removed at that time because it was obsolete and could no longer be used with any available methods of recovery. The defendant was not physically present on the land after 1972.

The evidence presented by the appellant to sustain its position was that beginning in 1970 numerous studies were conducted by the defendant corporation to determine the economic feasibility

of resuming production on the subject leases using more sophisticated and expensive methods of tertiary recovery. The studies were to determine the likely yield of such a project given the known information of the land's potential reserves and technology available to undertake the task, as well as the projected economic return on such a project using current crude oil prices and cost of development. Although the studies indicated production was profitable as early as 1970, the appellant declined to resume production because of the depressed economy existing at that time, particularly in the oil market. As the economic picture improved through the 1970's the appellant began to develop a plan to proceed with the development of the leases. Russell testified that in 1979 a specific plan had been formulated to resume production of the leases in 1980. The projected cost for the pilot project was $170,000, and $750,000 for full development of the entire lease. These plans were postponed when the lawsuit was initiated. Other leases owned by the appellant on adjoining tracts of land in the same oil formation were brought into production by the appellant in 1980 and 1981. Russell testified the corporation intended at all times to resume production when it would be more economically advantageous under existing market conditions. The leases were continually evaluated to effectuate that purpose. The corporation believed they were protected while not developing by the habendum clause contained in the leases, in that as long as the gas storage rentals were paid to the landowner they could postpone resuming production until the most economically advantageous time, which would be beneficial for both the corporation and the landowner. The leases were always considered to be assets by the corporation, property taxes were paid each year on one of the leases, and the required semiannual reports were submitted to the Kansas Corporation Commission designating all the wells as temporarily abandoned but unplugged and available for future use. The plaintiffs never requested that the appellant resume production or inquired as to its plans for future development. As soon as the lawsuit was filed the appellant expressed its willingness to begin immediate production. The corporation failed to pay property taxes on equipment on one of the leases for several years.

Both parties submitted briefs to the trial court, pursuant to the court's pretrial order, on the issue of whether the leases involved

in this action contained divisible provisions. Prior to trial the court issued a memorandum opinion setting forth its conclusions of law based upon its construction of the provisions contained in the leases and the applicable law. The trial court first held that by virtue of the continuous storage of natural gas on the property and payment of the gas storage rental, the leases were still in effect by the terms of the habendum clause, stating:

"Exhibits A and B cover Tract One. A careful reading of those two documents indicates that the habendum clause contained in paragraph Second of Exhibit B, has been complied with by the third party defendant and that it's compliance keeps the lease in force and the lease has not expired on it's own terms. None of the other provisions of either Exhibits A or B contain any language which modify that obligation.

"The lease contained in Exhibit D, covering Tract Two, is substantially different than Exhibits A and B. Pertinent language is contained in paragraph 2., the habendum clause, and paragraphs 6. and 12. These three provisions must be read together to determine the purport of the instrument. The language in paragraph 12. indicates the default of either owner shall not affect the other. That language does have the effect of creating independent rights upon the assignment of any interest. The language in the last sentence of paragraph 6. only applies during the primary term, prior to development, and, as the lease was developed and production had for some time, that language has no application to my considerations at this time. The lease terms in paragraph 2. indicate that the exercise of the gas storage rights is sufficient to meet the expressed terms of the lease and the language of paragraph 12. is not sufficient to change that basic language and I would find that, as to Tract Two, the lease does not expire on its own terms."

The trial court also ruled the provisions of the lease were partially divisible, and therefore the oil and gas production portion of the lease could be forfeited for failure to comply with the implied covenants, while the gas storage rights remained intact. Finally, the trial court found as a matter of law that the failure to produce the lease since 1965 constituted violation of an implied covenant to operate the leasehold efficiently and market the minerals, but found it necessary to have additional evidence presented on the factual issue of whether or not the defendant had abandoned the lease, to determine whether or not demand for performance was necessary before the defendant's lease interests would be cancelled. After hearing evidence presented at trial and actually viewing the land involved the trial court found there had been an intent to abandon the lease in 1966 until a time when it would become financially feasible to begin production, and that the removal of the power source from the

premises as well as the deterioration of the equipment remaining on the premises were evidence of external acts of abandonment. The trial court ruled the defendant's oil and gas production rights under the lease were void.

The defendant appealed to the Court of Appeals from the trial court's finding of abandonment and from the court's ruling that a demand upon the defendant for further development prior to cancellation of the lease was not necessary. Neither party challenged the trial court's ruling that the leases were still in effect under the terms of the habendum clause. The parties have not briefed this point for the court and further discussion of the case will proceed upon the assumption that this is the law of the case.

The Court of Appeals determined the trial court had inferred the intent to abandon from the appellant's *"breach of an implied covenant,"* and held the lessor should be required to give the lessee notice before a court will cancel the lease. The Court of Appeals ordered "that the oil and gas lease shall be deemed to be cancelled in the event defendant does not begin production efforts within 60 days" from the effective date of the judgment. 8 Kan. App. 2d at 415.

The parties to this appeal have briefed this case on the theory that the leases on Tract I and Tract II are identical insofar as the issues between them are concerned. Accordingly, we accept this proposition as the law of the case, but hasten to add our opinion should not be construed as finding them to be identical.

It is readily apparent from a reading of the documents establishing the two leases here under consideration that the parties contemplated, upon assignment of the leases, the severability of the storage portion of these leases from the oil and gas production portion of the leases. Furthermore, it is clear a default in either the storage portion of these leases or the oil and gas production portion of these leases would not affect the other.

Therefore, in accordance with the law of the case, this court is presented with a hybrid situation in which there are two identical oil and gas leases, valid and subsisting at the time this lawsuit was filed, where the storage portion of these leases has been severed from the oil and gas production portion of the leases by assignment. On the facts in this case those in privity with the lessor challenge the validity of these leases on the ground that the oil and gas production portion of these leases are terminated by abandonment.

The appellant's argument proceeds on the theory that these leases, by reason of their extended term and enlarged purposes (referring to the gas storage portion of these leases), continue the leases in force in their entirety to this date; and that abandonment of these leases therefore cannot be considered correctly in the context of abandonment of the usual oil and gas lease, where oil is discovered and production continued beyond the primary term followed by the termination of production because further production ceases to be profitable. In the usual oil and gas lease the appellant concedes under Kansas law the lease would terminate by its own terms when further production of the lease by the lessee was abandoned by reason of unprofitable production. The points material to our determination of the case asserted by the appellant are (1) whether the lessee abandoned its oil and gas production rights in these leases; and (2) whether the action should be dismissed for failure of the landowners to first make demand upon the lessee for further development in compliance with the implied covenants of the lease. Other points asserted by the appellant are immaterial.

At the outset it is appropriate to discuss the general rules governing the construction of oil and gas leases. Oil and gas leases containing ambiguities are to be strictly construed against the lessee-producer and in favor of the lessor-royalty owner because the lessee usually provides the lease form or dictates the terms thereof, and where the lessee desires it may protect itself by the manner in which the lease is drawn. See *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 458, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977); *Gilmore v. Superior Oil Co.,* 192 Kan. 388, Syl. ¶ 2, 388 P.2d 602 (1964). In *Jackson v. Farmer,* 225 Kan. 732, Syl. ¶ 7, 594 P.2d 177 (1979), the court summarized the pertinent rules as follows:

"Rules governing the construction of oil and gas leases include these: the intent of the parties is the primary question; meaning should be ascertained by examining the documents from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof."

A habendum clause in a lease, similar in effect to the one contained in the lease at issue here, stating "this lease shall remain in force for a term of five years from this date, and as long thereafter as production is had from said land by the said Lessee or assigns," was held in *Smith v. Holmes*, 181 Kan. 438, 441, 312 P.2d 228 (1957), to be clear and unequivocal where there were no conflicting provisions in the lease, so that the clause was to be given its plain and ordinary meaning without resort to further rules of construction.

The leases at issue here both contain clauses which extend the term of the interest beyond the primary term and as long thereafter as (1) oil or gas is produced on the property and/or (2) the gas storage rights are exercised and/or (3) the storage rentals are being paid. The leases also contain an assignment clause which states that upon any assignment of all or any portion of the leasehold interest the lessee "shall have thereafter no personal liability as to any covenant [thereof] in respect to the acreage or interest as to which assignment has been made."

For purposes of review it is noteworthy the trial court's ruling is in accord with the view expressed by modern authorities on oil and gas law that absent a contrary provision in the lease the habendum clause is unaffected by assignments or partial assignments by the lessor or lessee. See 2 Williams and Meyers, Oil and Gas Law § 406 (1983); 3 Williams, Oil and Gas Law § 604.10 (1981); 3 Summers, Oil and Gas § 512, p. 400-01 (perm. ed. 1958); *McCammon v. Texas Company*, 137 F. Supp. 256, 258-59 (D. Kan. 1955). In 2 Williams and Meyers, Oil and Gas Law § 406, it is stated:

"The habendum clause of the oil and gas lease is usually treated as indivisible. Hence such production or drilling operations anywhere on the leased premises as would have kept the lease alive into the secondary term had there been no partial assignment will keep the lease alive after the primary term as to all parties in interest—the original lessor, his assignees, the original lessee, and his assignees."

In the early development of the law relating to covenants implied in oil and gas leases, and before the doctrine of implied covenants was developed fully, there was a tendency on the part of courts to rely upon the doctrine of abandonment to explain results that would otherwise be reached by the enforcement of implied covenants. This tendency and the confusion of abandonment with the breach of implied covenants has been de-

scribed in considerable detail by Dr. Merrill in two sections of his monumental treatise on implied covenants. See Merrill, Covenants Implied in Oil and Gas Leases §§ 8, 9 (2d ed. 1940).

Merrill describes three situations in which abandonment may be confused with breach of an implied covenant. The first situation is where a lessee permits a lease to terminate under its express terms by failing either to drill or to pay delay rentals. In a sense, by so failing to act, the lessee has "abandoned" the lease, but the lease expired by its own terms, and such situation is properly identified as a termination of the lease rather than an abandonment.

The second situation noted in Merrill's analysis is where the lessee consciously intends to give up the lease and commits some positive act of abandonment. This is a true abandonment. Abandonment in this instance requires not only a physical relinquishment but a positive intention to abandon the lease.

The third situation posed by Merrill is where there has been no act done to demonstrate an intention to abandon but the lessee intends to postpone work of development while keeping the lease. Merrill summarizes this situation at p. 34 by saying:

"Abandonment is an intentional and voluntary relinquishment; an enforced and involuntary giving up of rights under the lease must be a forfeiture for breach of the obligations imposed by the implied covenants. The weight of authority recognizes this important and fundamental distinction."

Kansas has recognized that the lessee of an oil and gas lease has certain implied obligations under an oil and gas lease to develop and to operate the leased premises as a prudent operator. Such implied obligations have been expressed in terms of implied covenants that relate to the various phases of a lessee's operations in exploiting the mineral interest. In *Shaw v. Henry,* 216 Kan. 96, 99, 531 P.2d 128 (1975), the court recognized a classification of the implied covenants as follows:

"In Cohen, Implied Covenants in Kansas Oil and Gas Leases, 9 Kansas Law Review 7, the author notes six implied obligations arising from the lessor-lessee relationship: to drill a well, to develop the leasehold, to explore the leasehold, *to operate the leasehold efficiently,* to protect the leasehold from drainage and to market the minerals produced." (Emphasis added.)

With minor variations in expression, this classification is the same as the classification made by text writers on the subject. See 5 Kuntz, Oil and Gas § 55.1(c) (1978) for a comparison of

classification by Merrill, Summers, Williams and Meyers, and other legal commentators. The implied covenant "to operate the leasehold efficiently" is commonly identified as the implied covenant "of diligent and prudent operation." See, *e.g.*, 5 Kuntz, Oil and Gas § 55.1(c), pp. 15-16; *Temple v. Continental Oil Co.*, 182 Kan. 213, Syl. ¶ 2, 320 P.2d 1039, *reh'g denied* 183 Kan. 471 (1958); *Renner v. Monsanto Chemical Co.*, 187 Kan. 158, 167, 354 P.2d 326 (1960).

Such implied covenant requires the lessee, as part of its duty of diligent and prudent operation, to produce and market oil or gas after discovery. It is rarely invoked to require a lessee to produce, because ordinarily a failure to produce after the primary term because production is no longer profitable will result in termination of the lease. In the instant case, however, the covenant *is* involved because the lease has not terminated despite a cessation of production. The instant case is unusual in that it involves two oil and gas leases under which production ceased but which were nevertheless continued in force and effect by the express provisions of the habendum clauses in these leases relative to gas storage rights.

The implied covenant of diligent and prudent operation of the lease was recognized in *Shaw v. Henry,* 216 Kan. 96. There diligent and prudent operation of the lease by the lessee required the drilling of a salt water disposal well in order to continue production in compliance with an order from the Kansas Department of Health. Any analogy to the instant case ends with recognition of the implied covenant of diligent and prudent operation because the lease there was in constant production until the lessee complied with a "cease and desist" letter from the Kansas Department of Health.

The appellant throughout its brief relies exclusively on cases involving the implied covenant to fully develop the lease, citing, *Storm v. Barbara Oil Co.,* 177 Kan. 589, 282 P.2d 417 (1955); and *Sauder v. Mid-Continent Corp.*, 292 U.S. 272, 78 L.Ed. 1255, 54 S.Ct. 671 (1934), among many other cases. In all of the cases there was continuing production on the lease when the lessor sought cancellation of a portion of the lease for breach of the implied covenant to fully develop the lease. These cases demonstrate that a lease may be subject to partial cancellation as to the undeveloped portion of the leasehold for breach of the

implied covenant to fully develop the lease, but usually require that the lessor first make demand upon the lessee or partial assignee for further development prior to the entry of a decree terminating the undeveloped portion of the lease, or the order of the court may set a time within which further development must be commenced by the lessee before cancellation will be decreed. See, *e.g., Stamper v. Jones,* 188 Kan. 626, 642, 364 P.2d 972 (1961); *Renner v. Monsanto Chemical Co.,* 187 Kan. at 173-74; *Temple v. Continental Oil Co.,* 182 Kan. at 236; *Harris v. Morris Plan Co.,* 144 Kan. 501, 506-07, 61 P.2d 901 (1936); *Cowman v. Phillips Petroleum Co.,* 142 Kan. 762, 769-70, 51 P.2d 988 (1935); *Alford v. Dennis,* 102 Kan. 403, 407, 170 Pac. 1005 (1918).

Here the trial court determined the oil and gas production portion of these leases was severable from the gas storage rights of Cities Service, and correctly ruled the oil and gas production portion of these oil and gas leases could be terminated for abandonment of the lease or for failure to comply with the implied covenant of diligent and prudent operation, while the gas storage rights of Cities Service were retained intact. The trial court terminated the oil and gas production portion of these leases upon a finding of abandonment—the intentional and voluntary relinquishment of rights under the leases.

On the record here presented these two leases were *fully developed* and had been producing oil for many years after the primary term. Sixteen wells were producing oil on these tracts when Russell terminated production of these sixteen producing oil wells because they were incapable of producing oil in paying quantities under reasonable prudent operations.

Affirmative evidence that Russell knew the production portion of these leases assigned to him could be terminated by abandonment of production is illustrated by the written terms of the 1963 assignment of these interests to him by W. S. Fees. Both W. S. Fees, as assignor, and James E. Russell, as assignee, signed this document which had two parts: (1) Assignment of oil and gas leases, and (2) Bill of Sale.

In this document Russell expressly "covenants and agrees" for himself and his assigns:

1. That the producing oil wells on these leases capable of producing oil in paying quantities will be operated in a

good, prudent and workmanlike manner to the fullest extent of their capacity; and

2. Stipulates "that a well is capable of producing oil 'in paying quantities' so long as the value of the oil attributable to the Assignee's interest therein, less said Production Payment interest, exceeds the costs of operations . . . and that no such well will be plugged *or abandoned.*" (Emphasis added); and

3. Acknowledges his right to *abandon* wells which will not produce oil in paying quantities; and

4. That they will comply with *all implied convenants.*

The foregoing written acknowledgment and undertaking by Russell, in the assignment, coupled with Russell's positive acts which followed, all clearly support the finding of the trial court that Russell and his assignee abandoned these leases. Russell's actions supporting the trial court's conclusion include terminating production of all wells on these two leases with no further production activity on these leases for fifteen years, permitting equipment left on the property to rust and deteriorate, tearing down and removing the pump house after it was partially demolished in a storm, removing the power source equipment, and not physically going onto the premises in any manner after 1972.

Having abandoned the production of oil on these two leases, Russell and his assignee cannot now be heard to say those in privity with the lessor were required to demand and give notice that production be continued prior to termination of these leases for breach of the implied covenant of diligent and prudent operation.

Accordingly, the judgment of the trial court terminating these leases upon a finding of abandonment is affirmed, and the judgment of the Court of Appeals is reversed.