**REESE EXPLORATION, INC., Plaintiff,**

v.

**WILLIAMS NATURAL GAS COMPANY, Defendant.**

Civ. A. No. 90–4007–S.

United States District Court, D. Kansas.

June 5, 1991.

MEMORANDUM AND ORDER

SAFFELS, District Judge.

In this case, plaintiff Reese Exploration, Inc. ("Reese") alleges that defendant Williams Natural Gas Company ("WNG") negligently permitted injected gas from its gas storage field in Anderson County, Kansas to escape into the oil-producing zone beneath Reese's oil leases, precluding Reese from successfully recovering oil by waterflooding the leases. In terms of relief, Reese seeks monetary damages, as well as declaratory and injunctive relief. This matter was tried to the court on February 28 and March 1, 1991. After carefully considering the evidence adduced at trial and the applicable law, the court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

*Findings of Fact*

1. This lawsuit involves four oil and gas leases located in Anderson County, Kansas, commonly known as the Babcock, Brecheisen, North Koch, and South Koch Leases (hereinafter collectively referred to as "the Fees Group Leases.").

2. The Fees Group Leases are part of the Colony–Welda Field. WNG's gas storage fields, which are certificated by the Federal Energy Regulatory Commission ("FERC"), are identified as the North Welda Field, the South Welda Field, and the Colony Field. More than 2000 wells were drilled in the Colony–Welda Field from the 1920s to the 1960s.

3. Production in the Colony–Welda Field has been from three sands at 600, 800, and 900 feet deep. The 800–foot sand, known as the Squirrel sand, produces all of the oil and part of the gas. The Bartlesville/Colony Sand, located at approximately 900 feet, has historically produced gas exclusively.

4. The original oil and gas leases for the Brecheisen, North Koch, and a portion of the South Koch were executed at various times during 1922. In 1936 and 1937, these leases were modified by Supplemental Oil and Gas Leases.

Richard C. Byrd, Anderson, Byrd, Richeson & Flaherty, Ottawa, Kan., for plaintiff.

Teresa J. James, Donald W. Bostwick, Adams, Jones, Robinson and Malone, Wichita, Kan., Paul A. Karns, The Williams Companies, Inc., Tulsa, Okl., for defendant.

5. In 1936 and 1937, leases were executed in favor of W.S. Fees ("Fees") for oil, gas and gas storage rights on the Babcock and remaining portion of the South Koch lease. Thus, by the end of 1937, Fees owned the oil, gas and gas storage rights on all of the Fees Group Leases.

6. Fees executed Assignments of Oil and Gas Leases, dated February 24, 1937, and March 31, 1937, which conveyed to Cities Service Gas Company the following interest underlying the Fees Group Leases:

[a]ll the gas and gas rights (except gas and gas rights in formations below a depth of one thousand and fifty (1050) feet from the surface and except the gas used for recycling purposes now in the producing oils and while the same is so used) and all gas storage rights, and rights of way under or incident to all and singular the oil and gas leases, storage leases, and supplemental oil and gas lease agreements. . . .

The assignment between W.S. Fees and Cities Service Gas Company further states:

To have and to hold the same unto the said Assignee, its successors and assigns forever, *subject to* the terms and conditions of said oil and gas leases, storage leases and supplemental oil and gas lease agreements, and subject to the terms and conditions of that certain contract dated March 18, 1936, by and between Assignor and Assignee herein, and supplemental contract between the same parties, dated March 31, 1937.

(emphasis added).

7. Neither Cities Service Gas Company, nor its successor, WNG, has acquired any oil production rights, or rights to gas below 1050 feet with respect to the Fees Group Leases. Reese has the exclusive right to produce oil, and the obligation under Kansas law to produce oil in paying quantities, prudently operate the oil lease, and provide royalty to the landowner.

8. In 1979 and 1980, assignments of the South Koch, North Koch, Babcock, and Brecheisen oil and gas leases were executed by the Fees Revocable Trust to Charles A. Hardesty ("Hardesty").

9. In 1979 and 1980, Hardesty further executed assignments of the Brecheisen, South Koch, North Koch, and Babcock oil and gas leases to We–Kan Resources, Inc. ("We–Kan").

10. L.J. Reese, ("Mr. Reese") is the president and part owner of Reese, and he was the sole negotiator with respect to the acquisition of the Fees Group Leases from We–Kan. While Reese currently operates approximately 600 wells in Kansas, Oklahoma, New Mexico, and Texas, Reese has never previously operated any wells or waterfloods over gas storage fields. Reese owns approximately 31 leases in Kansas, primarily in Jefferson, Leavenworth, Miami, Douglas, Franklin, Anderson, Allen, Bourbon and Neosho counties. Most of Reese's oil production in eastern Kansas is in the Squirrel sand. As part of Reese's business it utilizes secondary recovery operations, primarily waterfloods. Reese has initiated 17 or 18 waterfloods on its properties. Normally, Reese requests 250 to 300 pounds of pressure and no more than 30 barrels of water per well per day from the Kansas Corporation Commission ("KCC") in his waterflood permits. Reese believes in a very slow injection rate and relatively low injection pressures in order to economically produce the oil from its leases. Mr. Reese testified that once he used high pressure and high injection rates (700 pounds and 100 barrels per well per day) in a lease in Miami County, Kansas, resulting in channeling between the high pressure injectors and the oil producing wells. Mr. Reese testified that when he purchases a lease he typically uses wells that are already drilled and tries to form a "line-drive" system for the waterflood. Mr. Reese believes that this allows him to begin production in the most economically feasible manner, without expending large sums of money in the initial phases of the lease. In designing the waterflood in question here, Reese simply utilized certain of the existing wells on the Fees Group Leases for his waterflood project, with the exception of the drilling of a water supply well and one other well. The Reese waterflood is a "random" pattern with "hodgepodge" spacing. However, Mr. Reese indicated

that the Fees Leases warranted further drilling, if only the high pressure gas were not present.

11. By agreement dated December 24, 1987, We–Kan agreed to sell to Reese its oil production interest in the Fees Group Leases and a group of other leases not pertinent to this proceeding.

12. Reese and We–Kan also entered into an Assignment of Oil and Gas Leases dated December 24, 1987. The assignment states in part as follows:

[a]ll leases in the Fees Group are subject to gas and gas storage rights granted to Cities Service and its successors....

13. With regard to the purchase of the Fees Leases, Reese got the legal descriptions of the lease and the past production records from Harold Kramer ("Kramer"). In addition, Kramer delivered a division order and title opinion for Mr. Reese's inspection. Mr. Reese was aware that he would be producing oil from a sand that was above the gas storage field of WNG in Anderson County, Kansas. Mr. Reese did not intend to affect any of the gas storage rights of WNG in that the oil producing zone was above the Bartlesville gas storage zone by some 150 to 200 feet.

14. Reese purchased the Fees Group Leases for $97,128. Of that amount, $67,029 was for equipment, most of which is surface equipment as opposed to down-hole equipment. In addition, plaintiff's Exhibit 1 demonstrates the cost of the installation of the waterflood to be $64,268.70, with operation of the waterflood costing $56,843.82 through January 31, 1990, and additional $39,728.98 for operation of the waterflood through January 31, 1991. The total cost of acquisition and operation of the waterflood is $257,969.51 through January 31, 1991. Plaintiff's Exhibit 2 shows that for the years 1988, 1989 and 1990, total cumulative production has yielded Reese $92,762.93; Reese's income from production in 1991 totalled $44,962.25.

15. After Reese purchased the Fees Group Leases, it filed an application in April 1988 with the KCC to waterflood a portion of the Fees Group Leases (the Babcock lease was not included in the application). The Reese waterflood application was approved by an order of the KCC dated November 8, 1988. The KCC order authorizing the waterflood granted the maximum injection pressure (300 psig) and rate (30 barrels per well per day) requested by Reese. The Babcock lease is not covered by the waterflood order, has no injection wells, and is not part of the Reese waterflood. The north half of the North Koch lease, although included in the waterflood order, is not a part of the actual waterflood project. At this time, Reese is actively injecting and waterflooding the Fees Group Leases. There are 11 water injection wells on the Fees Group Leases. Reese is injecting water into ten of those wells essentially every day, and one is temporarily abandoned. Although the KCC has approved injection at a rate of 300 psig, Reese is only injecting water at an average injection pressure of 220 psig.

16. Mark Arn is the contract pumper for Reese who is most familiar with the day-to-day operations of the Reese waterflood. Arn testified that there were ten producing oil wells, six flowing gas wells (meaning too much gas is present to pump fluid), and three shut-in wells.

17. Out of the 29 wells Reese purchased from We–Kan, 9 of the wells had never been able to have any work performed on them due to the high pressure gas. This high pressure gas presents severe safety problems in that the wells could not be pulled for workovers and if a spark or some accident would occur, a gas explosion would be highly probable. Of the wells that have high gas pressure, there has been absolutely no fluid production from these wells. These nine wells are located right down the center of the Fees Leases from the Babcock through the North Koch and the north half of the South Koch leases. Mr. Reese testified that but for the high pressure gas and his inability to institute a waterflood, he would have done a lot more drilling to efficiently and effectively produce the lease.

18. Mr. Reese communicated with WNG about the high volumes of gas and high pressure gas on those leases by talking to

Mr. Fred Lewis of WNG. In addition, Mr. Reese had written to Neil Foley of WNG. WNG offered no solution to this problem other than shutting-in Reese's oil production.

After purchasing the leases, Mr. Reese also discovered that WNG had placed lead lines on the leases connecting the oil wells to a compressor to capture gas produced with oil in the Squirrel formation and pipe the gas to a compressor to repressurize the gas and return it to WNG's storage system. At trial, both Mr. Reese and Mark Arn testified regarding two types of problems associated with the WNG compressor. First, due to the back up of high pressure, when the gas compressor failed to operate the lead lines would "blow out." Approximately three months after the purchase, Reese experienced a blow-out on the North Koch. The next blow-out occurred in May of 1988, soaked 15 to 20 acres of ground with oil and salt water and took Reese personnel three weeks to clean up. After the second blow-out in May of 1988, Reese disconnected the lead lines from his oil wells. WNG offered no monetary or engineering solution to resolve the blow-out problem. The second type of problem that occurred when the compressor went down was that the WNG personnel would shut-in Reese's oil production. Initially, WNG personnel would call from the Welda shop and state, "our compressor has gone down again, we've turned off your wells and we will call you when we are going to put it back on again." After litigation was filed, WNG would inform Reese that the compressor went down, but would not go out and shut-in Reese's oil production. However, Mr. Reese testified that once the compressor was shut down, the only alternative Mr. Reese had was to either shut-in his oil production or vent the gas to atmosphere.

19. The amount of gas that is currently found under the Fees Leases is a highly abnormal situation that does not occur naturally. According to plaintiff's expert witness, Duane McCune ("McCune"), the high levels of gas create additional difficulties in operation of a waterflood because any waterflood that attempts to push oil out of oil-erflood that attempts to push oil out of oil-

producing sand in an area of high gas saturation will compress the gas rather than push the oil. Additionally, if Reese was to increase the injection pressures on the waterflood, Reese would run the risk of pushing water down into the Bartlesville formation. If this were to occur, Reese would run the further risk of having the injected water come back up the WNG withdrawal/injector wells, possible contaminating the WNG system. Although McCune was unable to pinpoint exactly where within the field the gas migration is occurring he noted there were a number of techniques that WNG could have used that would have been able to identify the zone of migration. Finally, increasing the pressure of the Reese waterflood risks fracturing the Squirrel formation, thus compounding the problem of channeling.

20. Neil Foley, coordinator of special projects for WNG, described the history of the Colony–Welda Field as the field that was developed for primary production in the 1920s. The depletion of oil and natural gas began in the middle 1920s through the middle of the 1930s. At that time, Cites Service, WNG's predecessor, began gas storage on an experimental basis, injecting and storing gas in the North Welda and South Welda fields, including the area underlying the Fees Group Leases. As Foley stated, there were literally thousands of wells drilled in the North Welda, South Welda and Colony Fields from the 1920s through the 1950s and 1960s. Those wells were drilled into a number of producing zones including the Squirrel formation and the Bartlesville formation. Prior to the 1970s the plugging techniques in many thousands of holes ranged from very poor to non-existent.

21. Foley testified that every Mcf of gas that WNG places in storage is injected or withdrawn from the Colony–Bartlesville sand formation. Further, WNG does not inject, withdraw, or in any way control gas in any other formation, other than the Bartlesville formation. WNG admits that there is migration of gas from the Bartlesville formation to the Squirrel formation, however, WNG is unable to determine

where the migration is occurring. Also, the two zones are now in pressure communication whereby the pressures introduced into the Bartlesville formation are reflected in the Squirrel formation. Importantly, no witness on behalf of WNG nor any witness for that matter, were able to identify where the zone of transmission was between the Bartlesville and the Squirrel formations. The transmission could be occurring right next to a Reese producer or right next to a Reese injector.

22. WNG has known of communication between these two zones for over a decade. Although WNG has been aware of this problem it has failed to take any action which could identify the method of transmission. WNG's solution for an oil operator that finds high volumes of gas being produced in the oil zone was to plug the offending oil well. WNG has performed well casing tests as demonstrated by Exhibit 18. A well casing test allows the tester to increase the pressure in the well casing and determine, through monitoring the pressure, whether the well casing leaks. This particular process only tests whether the pipe has holes or is leaking and does not determine whether there are other methods of transmission between the Bartlesville zone and the Squirrel zone, i.e., outside the pipe.

All of WNG's gas injection and withdrawal wells are drilled into the Bartlesville formation through the Squirrel formation. All of the wells drilled by Mr. Reese or its predecessors were drilled into the Squirrel formation and do not in any way extend to the Bartlesville formation.

23. Exhibit 19 is a summary on an individual well-by-well basis of wellhead shut-in pressures. These pressure readings are taken normally in the spring and the fall on wells in the South Welda Field from 1970 through the fall of 1989. This exhibit plus the testimony of Foley demonstrate that WNG's gas storage field is utilized to balance demand on a pipeline system. The storage field operates from a low pressure towards the end of winter, when the storage field is depleted, with pressures increasing through the spring and summer

and reaching a peak in the fall. Exhibit 19 demonstrates that the field pressure has increased over the last two or three decades. In the 1970s, the pressures were in the 180 to 250 psi range, but towards the late 1980s, the pressures increased to the 300 to 450 psi range. This increase in pressure reflects an increase in the volume of gas that WNG is storing. Furthermore, WNG now stores the gas of other entities as well as its own gas pursuant to certain FERC transportation and storage tariffs. Further, the South Welda storage field is significant in that it serves the Kansas City market. WNG injects and withdraws substantial volumes of gas from the South Welda storage field; in 1989 over 12,000,-000 Mcf of gas were injected and withdrawn. WNG's gas storage facility was originally certificated by the Federal Power Commission, now the Federal Energy Regulatory Commission ("FERC"), and is regulated by the FERC pursuant to the authority of the Natural Gas Act, 15 U.S.C. § 717, et seq.

24. Aside from plugging wells that have been gassed out, WNG has done nothing to identify where the zone of communication if between the Bartlesville zone and the Squirrel zone. This lack of action is in spite of WNG's demonstrated knowledge that the Bartlesville-stored gas has been communicating with the Squirrel oil zone for over a decade. Plaintiff's Exhibit 20 demonstrates that WNG knew that there was going to be oil production from the Squirrel zone as early as 1985, and that Squirrel production would exist for at least 20 years. Exhibit 20 demonstrates that WNG identified between 200 to 300 Mcf per day of vented gas in the South Welda Field. The amount of gas that was captured and reinjected through the South Welda booster amounted to 3,521 Mcf per day, or 1,285,165,000 cubic feet per year. Further, Exhibit 21 demonstrates that over 100,000,000 cubic feet of natural gas was being vented in the South Welda Field, with that volume representing 30 percent of the annualized collective losses for the North Welda, South Welda and Colony Fields. WNG also admitted that high pressure gas in the Squirrel zone presents sig-

nificant safety problems for the oil operators.

25. In December of 1990, nine gas/oil ratio tests were taken on various Reese wells. The gas/oil ratio tests determined, as the name indicates, the ratio of gas to oil along with other related pressure and volume information. These gas/oil ratio tests, Exhibit 58, show tests for the North Koch No. 1, the Babcock No. 3, the North Koch No. 4, the North Koch No. 5, the North Koch No. 8, the 1–87, the Babcock No. 4, the Babcock No. 2, and the South Koch No. 3. These wells run virtually right down the middle of the Fees Group Leases from the Babcock through the North Koch and half way through the South Koch. These gas/oil ratio tests showed that large volumes of gas were produced with very little fluid. Additionally, after being tested the pressure in the wells built back up very rapidly. For instance, on the North Koch No. 1 the pressure rebounded to 375 pounds, from a low of 60 pounds within two hours. Additionally, these tests demonstrate that the volume of gas being produced from Reese's North Koch No. 1 well approaches 800,000 Mcf per day.

26. As stated previously in these findings, Reese is still operating a waterflood on part of the Fees Group Leases and is getting some production. Water was being injected into ten injection wells every day. There are ten producing wells on the leases and the gas does not prevent them from producing. (Tr. 216). Oil production in 1990 totaled 2,162 barrels of oil from these leases.

27. A reserve study performed by plaintiff's expert McCune predicted that, without the presence of any gas the Reese waterflood might expect to have production for the period June 1, 1990, through December 31, 1990, of 1,500 barrels of oil. On an annualized basis, this would mean a total 1990 production of 2,600 barrels of oil. Since McCune testified that there was no primary oil production left on the Reese leases and his reserve study related only to secondary production from the waterflood. Even with the presence of gas, McCune admitted that he was not saying that the waterflood would fail entirely, and he further admitted that the south end of the leases would get some effect from the waterflood and there should be waterflood response in the wells which did not have high gas volumes.

28. In the reserve study of the Fees Leases, plaintiff's Exhibit 6, McCune determined the value of recoverable oil in place under the Fees Leases and then performed an economic analysis to determine the value of that oil. In order to determine the reserves, McCune determined the thickness of the pay zone under the Fees Leases, and calculated the amount of recoverable oil. The total of the primary and secondary recoverable oil under the Fees Leases is 25 percent of the original oil in place, or 135,000 barrels of oil. McCune then projected the remaining life of the waterflood, projection to its economic limit, and then calculated the value of that oil. McCune used two pricing scenarios, 1) utilizing $18 per barrel cost which did not escalate over time and, 2) utilizing an $18 barrel at the beginning of the waterflood escalating at 5 percent per year until the oil reached $35 per barrel. In both of the valuation scenarios expenses were included. The cumulative cash flow at the end of the life of the project was $811,496 with a discounted present value of $555,987. In the escalated scenario the cumulative cash flow at the end of the life of the project was $941, 872 with a discounted value of $642,605. These analyses were utilized only current wells, when direct offset wells were included, the economic value of the lease goes to $1,606,512 on the escalated scenario and, $1,389,967 on the constant oil price scenario.

29. Mr. R. Douglas Myers ("Myers") testified on behalf of WNG as an expert witness dealing with petroleum engineering. Myers did not present a reserve study indicating the amount of oil underneath the Fees Leases but rather pointed out potential deficiencies in the reserve study performed by McCune and in Reese's waterflood. Myers agreed, however, with McCune's conclusion that the total amount of recoverable oil on the leases was proba-

bly in the area of 25 percent, considering both primary and secondary recovery.

*Conclusions of Law*

The court has subject matter jurisdiction over the claims being asserted and personal jurisdiction over defendant. Venue is also proper in this district.

A. The Parties' Rights Under the Leases.

■ The threshold question before this court is whether Reese has the right to produce oil from the Squirrel sand without interference from WNG's gas storage field. From examination of the leases in question and upon review of the parties' arguments, the court concludes that plaintiff and defendant have co-existing rights to produce oil and to store gas, respectively, that neither party's right is superior to the other's and that neither party should interfere with the other's exercise of its rights under its respective lease.

Reese acquired the right to produce all of the oil underneath the Fees Leases, and all of the natural gas below 1050 feet. WNG acquired the right to store gas, and purchased royalty gas above 1050 feet. WNG argues that it has purchased the right to store gas at all depths above 1050 feet, and therefore, WNG gas in the Squirrel sand has not escaped but rather the gas is stored in a zone that falls within WNG's rights. This argument does not comport with the language of the supplemental oil and gas lease agreements nor, more importantly, the assignment of gas storage rights from W.S. Fees to Cities Service Gas Company. For example, the Babcock oil and gas lease expands the 1922 oil and gas lease "... for the purpose of introduction and storage of gas therein ..." (Exhibit 405, ¶ 1). Pursuant to paragraph 7, the lessee agrees that there is no commercial gas at depths above 1050 feet, and that lessee may store gas "in sands or strata not exceeding such depth ..." Exhibit 406 has identical language, although it deals with the South Koch property.

The supplemental leases dealing with the Brecheisen, South Koch and North Koch are all of a similar nature, although different in two important aspects. These leases also expand the original 1922 oil and gas leases to include "... the introduction, storage and/or removal of natural gas to, in, from and under said real estate." (Exhibits 407–410, ¶ 1). However, this grant is clarified by a clause, which states "Lessee is now producing oil and/or gas from the real estate above described ... and it is lessee's desire to bring from distant points quantities of natural gas and introduce the same under pressure *into the gas sands* ... and to conduct experiments in connection with the underground storage of natural gas...." (emphasis added). Also, the only reference to 1050 feet is in the provision that deals with royalty gas, specifically paragraph 3, and this provision does not mention storage rights (as do Exhibits 405–406).

A strict reading of these leases demonstrates that the lessee purchased all gas above 1050 feet, or agreed that there was no commercial gas above 1050 feet. Also, clearly the lessee was granted the right to store natural gas below the Fees Leases. Under one set of documents, Exhibits 407–410, that right is generally to the real estate although clarified in the "whereas" clause to "the gas sands." In the other set of documents the right of storage is granted in the first paragraph and connected to the land in general, and in paragraph seven limited by the language "lessee may store its gas in sands or strata not exceeding such depth" (*i.e.*, 1050 feet).

The supplemental leases do not state that WNG has the right to store gas in all formations from the surface to 1050 feet. More importantly, the only documents that grant gas storage rights to WNG, Exhibits 411 and 412, do not state the property right that WNG claims. Further, through the operation of geology, engineering and the history of the field WNG has selected its storage zone, the Bartlesville sand. This is consistent with the language in Exhibits 407–410, regarding the intent to inject gas into the "gas sands." Consistent with the operations of the gas storage field WNG injects and withdraws gas solely and exclusively from the Bartlesville sand. Indeed, Neil Foley testified that WNG has no way

to control gas in any other formation, other than the Bartlesville formation. All of the WNG wells are completed in the Bartlesville formation. Thus, the Bartlesville sand constitutes WNG's lawful gas storage zone under the Fees Leases.

This conclusion comports with the fact that Reese has the sole right to produce oil under the Fees Leases. It is uncontroverted that oil production dates back to the 1920s in this field. The fact that gas storage was severed from the original oil and gas lease indicates the intent to both store gas and produce oil. If the storage rights are construed to mean storage from the surface to 1050 feet, the question of what oil rights remain from the surface to 1050 feet becomes troublesome, especially since oil production in the Squirrel zone was known at the time the storage rights were created. The only way to construe all of the leases together such that the results are reasonable, and in a manner that does not negate one lease provision at the expense of another is to conclude that WNG had the right to store gas above 1050 feet, has elected to store the gas in the Bartlesville sand, and therefore defined its storage zone, and does not now have the right to change its gas storage zone to the detriment of other mineral interest owners.

█ In a sense this case is similar to the problem of the relocation of easements. WNG's predecessors received a right to store gas above 1050 feet, and for the above-stated reasons elected to store gas in the Bartlesville sand. Now, once challenged, WNG asserts that it is not limited to the Bartlesville, but can store gas to the surface. This situation is similar to that of a party that acquires a general easement, takes actions that specifically define the easement, and then attempts at a later date to relocate the easement. The general rule in such situations is "[o]nce the location of an easement has been finally established, whether by express terms of the grant or by use and acquiescence, it cannot be substantially changed without the consent of both parties." *Youngstown Steel Products. Co. v. Los Angeles*, 38 Cal.2d 407, 240 P.2d 977, 979 (1952) (citation omitted). *See*

*also Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 531, 441 P.2d 802, 805 (1968) (stating "[t]he character and extent of the rights created by a grant of easement is determined by the construction of the language of the grant and by the extent of the use made of the dominant tenement at the time of the grant") (citation omitted).

In the present case, WNG seeks to substantially change the nature of its storage field from solely in the Bartlesville sand to anywhere there is gas between the surface to 1050 feet after 50 years of gas storage operation. Further, WNG seeks to do this without the consent of other mineral interest owners which are affected by this change. This is a course of action that is not allowed by the law.

In support of its argument that its gas storage rights are superior to Reese's oil production rights, WNG points to the "subject to" language in the assignments from Fees to Hardesty and the assignments from We–Kan to Reese (the assignment from Hardesty to We–Kan contained no "subject to" language). Reese points to the fact that the assignment from Fees to Cities (Exhibits 411–412) state: "subject to the terms and conditions of said oil and gas leases, storage leases and supplemental oil and gas agreements." Thus, it appears that both interests are subject to each other. This construction is logical due to the fact that two different mineral interests are being discussed, relating to gas storage and oil production, respectively.

WNG further argues that Reese failed to fully investigate the nature of the Fees Leases prior to their purchase. However, Reese determined prior to the purchase of the leases the nature of WNG's gas storage rights. Reese also determined the geological fact that gas storage was occurring 200 feet below the oil production zone. Since Reese was not going to affect WNG's storage operation, this was all the investigation that was necessary.

B. Negligence.

█ Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right.

*Cooper v. Eberly*, 211 Kan. 657, 508 P.2d 943, 949 (1973). Under Kansas law, a person is entitled to use their own premises for any lawful purpose. However, a landowners' freedom to use his premises is not absolute, but is subject to important qualifications that such use be ordinary and usual, conforming to a standard of care expected of a reasonably prudent person. Failure to conform to that standard, even by a landowner, may constitute negligence. *Mid–Century Ins. Co. v. Latimer*, 211 Kan. 810, 508 P.2d 935, 940 (1973). Similarly, a lessee under an oil and gas lease must operate in a prudent manner. *Fischer v. Magnolia Petroleum Co.*, 156 Kan. 367, 133 P.2d 95 (1943). In summary, Reese must demonstrate that WNG had a duty towards Reese, WNG violated that duty, the violation was the cause of damages, and the amount of damages incurred.

In this case, WNG admitted that its storage gas is escaping from the Bartlesville zone and infiltrating the Squirrel zone at storage pressures. A duty exists between WNG and Reese resulting from their property interests to produce, or store, minerals under the Fees Leases. WNG has known for over a decade that the gas is escaping from the Bartlesville sand and infiltrating the Squirrel sand, as Neil Foley's testimony demonstrates. Further, WNG was fully aware that the Colony–Welda Field contained thousands of old well holes, often poorly plugged and leaking gas. Finally, plaintiff's Exhibit 20 demonstrates that WNG knew that there was going to be oil production in the Squirrel zone as early as the mid–1980s, and that such production would exist for at least 20 years.

WNG took no action to identify where the communication was occurring between the Bartlesville and the Squirrel sand. It is uncontroverted that neither WNG nor Reese nor their respective experts were able to identify where that communication is occurring. The communication could be occurring right next to a Reese injector, Reese producer, or WNG injection or withdrawal well, or some other place. All that is known for certain is that communication is occurring.

Finally, it is undisputed that WNG has no mechanism to control gas that has escaped from the Bartlesville formation. All of WNG's injection and withdrawal wells are completed in the Bartlesville formation, and in no other formation. Reese's wells are completed only in the Squirrel formation and in no way endanger WNG's gas storage facility. In the court's view, requesting the oil operator to plug an offending gassed-out oil well does not constitute a solution, especially in light of the fact that WNG has no right to affect another person's oil production rights; further, WNG's solution of plugging gassed out oil wells, resulting in the loss of proven oil reserves, is also contrary to Kansas law and Kansas public policy prohibiting waste of natural resources. K.S.A. 55–601.

The court concludes that WNG had a duty to Reese, violated that duty, and that Reese has suffered damage. With regard to the element of causation, the existence of large volumes of high pressure gas in the Squirrel formation is undisputedly an abnormal and unnatural situation; it is further undisputed that the cause of this situation is the existence of the gas storage field. The persuasive testimony of McCune demonstrates that a waterflood will not function as well in the presence of large volumes of high pressure gas. WNG's claim that the waterflood is ill-formed and poorly engineered missed the mark, that being that WNG has no right to interfere with any of the oil production rights. Although WNG pointed out that other waterfloods in the area are operating at higher pressures and higher injection rates, there was no evidence put forth that the other waterfloods have experienced high gas pressure in their producing zones. Thus, the operations and results of the other waterfloods are neither directly relevant nor controlling in the present case.

C.  Appropriate Relief.

The only remaining issue to be dealt with by the court is that of appropriate relief. In support of its claim for monetary dam-

ages, plaintiff presents the reserve study conducted by its expert McCune which estimates the value of remaining oil at between $555,987 and $642,605 on existing wells and between $1,606,512 and $1,389,967 if offset wells are drilled. Reese also argues that the court has authority under *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985), to declare the gas to be free gas such that whoever produces the gas becomes its owner. Finally, Reese requests injunctive relief requiring WNG to lower its storage field pressure to 285 psi, the pressure of the field in its virgin state.

WNG's South Welda storage field is certificated and regulated by the FERC. One of the alternative forms of relief requested by Reese is that WNG be ordered to reduce pressures in the storage field from current levels (which at times may be as high as 440 psig) down to approximately 285 psig. Such relief, if granted, would restrict the storage rights authorized and granted to WNG by FERC order because the lower the pressure, the smaller the volume of gas that can be stored. Thus, Reese's request involves the issue of primary jurisdiction.

As a court in this district stated: [t]he doctrine of 'primary jurisdiction' applies in situations where a claim, originally cognizable in the courts, requires the resolution of issues which, under a regulatory scheme, have been placed in the hands of an administrative body. In cases where the doctrine is found to apply, the judicial process is suspended pending referral of such issues to the administrative body for its views. The purposes for the doctrine of primary jurisdiction are primarily desire of uniformity in decisions regarding administrative questions and resolution of particular economic or technical issues by an agency having the particular expertise and specialized knowledge. *Id.*

*Commander Properties Corp. v. Beech Aircraft Corp.*, 745 F.Supp. 650, 652 (D.Kan.1990) (citations omitted.)

The doctrine of primary jurisdiction applies in this case because the determination of the maximum acceptable storage pressure is within the particular expertise of the FERC. Moreover, the interests in uniformity and consistency in the regulation of underground storage are best served by the FERC's resolution of this issue. Thus, injunctive relief as proposed by plaintiff is problematic in light of this doctrine. For example, in *Williams Natural Gas Co. v. Oklahoma City*, 890 F.2d 255 (10th Cir.1989), a state court injunction against the exercise of rights under a FERC Certificate of Public Convenience and Necessity was held to constitute an impermissible collateral attack on the FERC order. The Tenth Circuit further held that "a collateral challenge to the FERC order could not be entertained by the federal district court." *Id.* at 264.

Similarly, in *Lewis v. Transcontinental Gas Pipe Line Corp.*, 200 F.Supp. 219 (S.D.Tex.1961), plaintiffs' action to remove a cloud on their title to gas leasehold interests was dismissed for failure to first exhaust administrative remedies before the Federal Power Commission. The district court concluded:

[s]ince the cloud on Plaintiffs' title is being caused by the certificate of public-convenience and necessity issued by the Federal Power Commission, the Plaintiffs have not exhausted their administrative remedies because they have not sought relief from said Commission.

*Id.* at 220.

In this case, the problems which Reese is experiencing are a result of WNG's FERC certificated storage operations. Reese admittedly has not sought relief through the FERC and the court finds that Reese cannot collaterally attack the FERC certificate here by asking this court to design and monitor WNG's storage operations, including its storage pressure. Clearly, gas storage operations are matter of public importance and involve policy decisions by the FERC. *See, e.g., Ellis v. Arkansas Louisiana Gas Co.*, 450 F.Supp. 412, 422 (E.D.Okla.1978), *aff'd*, 609 F.2d 436 (10th Cir.1979), *cert. denied*, 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1980). Thus, Reese's request for injunctive relief will be denied.

The court also finds that plaintiff's request for declaratory relief based on *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985), must also be rejected. In *Anderson* the Kansas Supreme Court held that adjoining landowners had the right to recover and keep injected gas which, without authorization or consent, had moved under their property. *Id.* at 1032.

In this case, some of WNG's storage gas is migrating vertically from one zone (the Bartlesville/Colony sand at a depth of 900 feet) to another zone (the Squirrel sand at a depth of 800 feet) rather than horizontally onto an adjoining landowner's property. Therefore, this case is factually distinguishable from *Anderson* and *Anderson* does not provide sufficient legal support for plaintiff's claim to ownership of WNG's gas. Thus, plaintiff's request for declaratory relief should also be rejected.

Finally, the court must address the issue of appropriate monetary damages. Reese's claim that migrating gas from WNG's storage zone interferes with Reese's recovery of oil through its waterflood operations on the Fees Leases is a claim for permanent damage to Reese's property (*i.e.*, its rights under its oil lease). The measure of damages for permanent injury to property is the difference in the fair market value of the property before and after the injury. *Maxedon v. Texaco Producing Co.*, 710 F.Supp. 1306, 1310 (D.Kan.1989); *Williams v. Amoco Production Co.*, 241 Kan. 102, 110, 734 P.2d 1113, 1120 (1987). The basic principle of damages is to make a party whole by putting him or her back in the same position as if the injury had not occurred, not to grant a windfall. *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.*, 236 Kan. 183, 189, 690 P.2d 380, 385 (1984).

Reese seeks to recover damages in four categories: (1) the cost of acquiring the Fees Group Leases and equipment; (2) the cost of installing the waterflood; (3) its operating expenses; and (4) the loss of recoverable oil (estimated by the McCune reserve study as a minimum of $555,987). These damages, however, assume that Reese's waterflood will not work at all; the evidence presented at trial, however, was that Reese was obtaining income from production on the leases, and that production must be considered in determining an appropriate award of monetary damages.

The court finds that Reese's claim for monetary damages should be reduced in the following respects:

1. Reese claims the entire allocated leasehold purchase price of $97,128. This does not comply with the rule for damages to property which allows only the difference between the fair market value of the property before the injury and the fair market value of the property after the injury. *See Williams*, 241 Kan. at 110, 734 P.2d at 1120. According to the evidence at trial, the cost of the equipment on the Fees Group Leases totaled $67,029, most of which was surface as opposed to down hole equipment. Therefore, the maximum recoverable amount on the purchase price would be only $30,099 (the purchase price of $97,128 less the salvage value of the equipment of $67,029).

2. Further, Reese's income from production on these leases ($92,762.93 prior to January 1, 1990 and an additional $44,962.25 after January 1, 1990 for a total of $137,725.18), should be credited against its costs for installing the waterflood ($64,268.70) and its operating expenses ($96,572.80) for a total expense figure of $160,841.50, and a resulting figure of $23,116.32 when income is subtracted. This reduction compensates Reese for its injury without producing any windfall.

3. As to the claim for nonrecoverable oil lost, the minimum amount of Reese's claim as stated in the McCune reserve study is $555,987. The court finds the price and recovery estimations underlying this amount are not unduly speculative, given the generally persuasive testimony of plaintiff's expert witness McCune. To allow this entire figure as damages in this case would, however, constitute a windfall to plaintiff because production, albeit interfered with by WNG's migrating gas, is occurring. Thus, based upon the only data presented to the court at trial on the ques-

tion of the extent of interference, *i.e.*, 1990 production figures of approximately 2160 barrels as opposed to the 2600 barrels predicted by the McCune reserve study, the court finds that only 17% of the $555,987 claim for nonrecoverable oil should be awarded, *i.e.*, $94,517.79.

4. Based upon the amounts calculated in items 1–3, the court finds that an appropriate total damage award to plaintiff in this case is $147,733.11.

IT IS BY THE COURT THEREFORE ORDERED that the Clerk of the Court is directed to enter judgment in favor of plaintiff Reese Exploration, Inc. in the amount of $147,733.11.